UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br>　　　　　Debtors. | Chapter 11<br><br>**Case No. 08-13555 (JMP)**<br><br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC. AND LEHMAN BROTHERS SPECIAL FINANCING INC.,<br>　　　　　Plaintiffs,<br>　　　　　v.<br>LIBRA CDO LIMITED,<br>BANK OF AMERICA, N.A., TRUSTEE, and LASALLE BANK NATIONAL ASSOCIATION, TRUSTEE, and SOCIÉTÉ GÉNÉRALE, NEW YORK BRANCH,<br>　　　　　Defendants. | Adversary Proceeding No. 09-ap-01177 (JMP) |
| LIBRA CDO LIMITED, BY BANK OF AMERICA, N.A., as successor by merger to LASALLE BANK NATIONAL ASSOCIATION, as Trustee, and SOCIÉTÉ GÉNÉRALE, NEW YORK BRANCH,<br>　　　　　Plaintiffs,<br>　　　　　v.<br>LEHMAN BROTHERS SPECIAL FINANCING INC.,<br>　　　　　Defendant. | Adversary Proceeding No. 09-ap-01178 (JMP) |

## LIBRA PARTIES' SUPPLEMENTAL MEMORANDUM OF LAW

MAYER BROWN LLP
Steven Wolowitz
Brian Trust
Mark Hanchet
Christopher J. Houpt
1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for*
*Libra CDO Limited, by Bank of America, N.A.,*
*as successor by merger to LaSalle Bank National*
*Association, as Trustee;*
*Bank of America, N.A., Trustee;*
*LaSalle Bank National Association, Trustee; and*
*Société Générale, New York Branch*

By permission of the Court, the Libra Parties submit this Supplemental Memorandum of Law. At the outset of the August 26 hearing, counsel for Lehman confessed an intent "to say some things that the Court has not already seen in the briefs." Tr. 108:19–20. Indeed, virtually all of Lehman's argument was new, and much of it consisted of misstatements and distortions regarding positions taken in the Libra Parties' pleadings and motion papers.[1]

Rather than addressing the real issue in this case—the meaning of the relevant provisions of the Credit Default Swap Agreement and the Indenture relating to termination—Lehman's oral argument revolved around the incorrect assertion that the Libra Parties had made admissions in its papers. However, more important than any after-the-fact characterization, the actual termination notice that was sent was expressly limited to "all outstanding Transactions." The October 10, 2008 termination notice ("the October 10 Notice") specifically referred to, and tracked the language of, Section 6(a) of the ISDA Master Agreement, explicitly stating that Libra *"designate[d] October 10, 2008 as the Early Termination Date in respect of all outstanding Transactions."* Hershan Decl., Ex. E (emphasis added). The consequences of a designation of an Early Termination Date for outstanding Transactions is specifically addressed in Section 6(c)(ii) of the ISDA Master Agreement. As shown below, nothing that the Libra Parties or Lehman have argued thereafter can change the consequences of that termination notice.

---

[1] For example, Lehman falsely asserted at the hearing that it was only in the Libra Parties' Reply Brief that the Libra Parties drew the "distinction between terminating all the transactions and terminating the agreement." Tr. 118:20–119:8. To the contrary, not only did the Libra Parties draw the distinction between terminating Transactions and terminating the Agreement in their very first brief, the Cross-Motion for Summary Judgment, but Lehman expressly observed that the Libra Parties had done so. Lehman explicitly recognized, in its opposition to the Cross-Motion, that the Libra Parties argue that "(1) Section 5.2(c) does not apply to the 'Transactions' under the Credit Default Swap Agreement but only to the Credit Default Swap Agreement itself." Lehman Opp. ¶ 46. The Creditors Committee likewise acknowledged that the Libra Parties drew this critical distinction in their Cross-Motion. The Committee acknowledged: "The Libra parties next argue that their termination was valid because they only purported to terminate the 'CDS Agreement Transactions,' rather than the Credit Default Swap Agreement itself. Mot. at 57. In particular, the termination notice designated an Early Termination Date 'in respect of all outstanding Transactions' under the Credit Default Swap Agreement. Thus, the Libra parties argue that the termination did not run afoul of the prohibition against terminating the Credit Default Swap Agreement." Comm. Opp. 7.

I. **Contrary To Lehman's Assertions At The Hearing, The Libra Complaint Alleges That The October 10, 2008 Notice Terminated The Transactions; There Are No "Judicial Admissions."**

At the hearing, Lehman incorrectly (and for the first time) asserted that the Libra Parties had alleged in their Complaint that the October 10 Notice terminated only the Credit Default Swap "Agreement," and that the Libra Parties' request for summary judgment merely seeks a declaration that the termination of the "CDS Agreement" was valid. Tr. 121:1–22. To the contrary, the Libra Parties' Complaint alleged that Libra validly terminated both the Agreement *and* the Transactions, and the Libra Parties' Cross-Motion seeks summary judgment on only the latter—a judgment declaring that the termination of the *Transactions* was valid.

    A. **Lehman's Very First Brief Acknowledged That The Libra Complaint Alleged That The October 10, 2008 Notice Terminated All Outstanding Transactions.**

Lehman hinges its case on the invalidity of a termination of the Credit Default Swap *Agreement*. But if the Court holds, as has been shown, that termination of the *Transactions* was valid under Section 6(a) of the ISDA Master Agreement and Part 1(i)(vii) of the Schedule, and that the Indenture did not invalidate the termination of the *Transactions*, then the Court should grant the summary judgment request of the Libra Parties and uphold the termination of the Transactions. The Court should do so even if it also grants that portion of the Lehman Motion seeking a declaration that the *Agreement* was never terminated.

Contrary to Lehman's statements at the hearing, the Libra Parties' Complaint alleged that Libra terminated both the Agreement *and* the Transactions. Libra Cmplt. ¶ 57 ("Pursuant to Section 6(a) of the ISDA Master, which as stated above is not limited as against LBSF by the terms of the Indenture, Libra terminated the CDS on October 10, 2008, by delivering a Notice of Early Termination designating October 10, 2008 as the Early Termination Date of the CDS Agreement ***and all outstanding transactions thereunder***.") (emphasis added).

Likewise, in their Answer, the Libra Parties *denied* the allegations in paragraph 30 of Lehman's Complaint, which asserted, among other things, that the October 10, 2008 Notice terminated only the Credit Default Swap *Agreement*. Lehman's Complaint (¶ 30), mischaracterized the October 10 Notice, alleging that

> By letter dated October 10, 2008, in violation of the automatic stay, the Trustee designated that date as the "Early Termination Date" for the Credit Default Swap Agreement, thereby purporting to terminate the Credit Default Swap Agreement. * * *

Lehman Cmplt. ¶ 30. In their Answer, the Libra Parties asserted that the October 10 Notice terminated the Transactions, and alleged that this had the legal effect of terminating the Agreement:

> Defendants deny the allegations contained in Paragraph 30 of the Complaint, except admit that on October 10, 2008, the Trustee declared October 10, 2008, to be ***the Early Termination Date for all outstanding Transactions under the Credit Default Swap Agreement, thereby terminating the Credit Default Swap Agreement***, and respectfully refer this Court to the Indenture and the Credit Default Swap Agreement for a true and complete statement of their contents.

Libra Answer ¶ 30 (emphasis added).

In fact, Lehman's first brief—which referred to the pleadings of the Libra Parties—explicitly recognized that the Libra Parties had alleged that the October 10 Notice terminated the *Transactions*:

> The Trustee and Libra rely on Section 6(a) of the Credit Default Swap Agreement, which provides a right to terminate "***all outstanding Transactions***" following an event of default thereunder. Libra Compl. ¶ 41 (quoting ISDA Master § 6(a)).

Lehman Motion ¶ 40. Accordingly, even before the Cross-Motion, Lehman recognized the Libra Parties' position that the October 10 Notice terminated the Transactions.

Although the Libra Parties' Complaint alleges a termination of both the Transactions and the Agreement, the Cross-Motion seeks summary judgment on only the former theory. *See, e.g.*,

3

LIBRA PARTIES' SUPPLEMENTAL MEMORANDUM OF LAW

Cross-Motion at 74 (seeking "a judgment declaring that (a) the termination *of the Transactions* was valid; and (b) the automatic stay does not bar or invalidate the termination *of the Transactions*."); Libra Parties' Proposed Order ("(1) the termination of the Credit Default Swap Agreement *Transactions* between Lehman Brothers Special Financing Inc. ('LBSF') and Libra CDO Limited was valid; (2) the automatic stay does not bar or invalidate the termination") (emphasis added).

The Libra Parties' additional allegations concerning the Agreement do not preclude judgment on their Complaint's allegation that the October 10 Notice terminated the Transactions, precisely as the October 10 Notice states. Accordingly, and for all the reasons set forth in the Libra Parties' papers and at the hearing, the Court can and should grant the Cross-Motion and issue the judgment requested in Libra's Proposed Order, a declaration that Libra validly terminated the Transactions.[2]

### B. Lehman's New "Judicial Admissions" Theory, And Its Attempted Use Of An October 31, 2008 Letter, Are Invalid.

Based on its newly-raised and incomplete rendition of the pleadings, and an October 31, 2008 letter that does not form part of the contracts in dispute, Lehman now apparently argues that the Libra Parties have conceded that only the Agreement was terminated. That conclusion requires a distortion of the record and applicable law and should be rejected.

---

[2] Lehman also argued for the first time that Section 5.2(c)'s prohibition on termination of the Credit Default Swap Agreement must benefit LBSF, because the prohibition on termination of the *Senior* Swap Agreement benefits LBSF. This is simply a *non sequitur*. As shown in the Libra Parties' briefs and as demonstrated at the hearing, Section 5.2(c) prohibits Libra from agreeing with Lehman to a consensual termination of the Credit Default Swap Agreement, because that could injure the beneficiaries under the Indenture who count on a performing Credit Default Swap Agreement, *i.e.*, the Noteholders. Section 5.2(c) likewise prohibits Libra from agreeing with the Senior Swap Counterparty to a consensual termination of the Senior Swap Agreement, because it could injure the beneficiaries under the Indenture who could benefit from *that* agreement, including LBSF.

### 1. Lehman Mischaracterizes Libra's Statements As "Judicial Admissions."

Lehman "relies on a misunderstanding of the nature of judicial admissions, which are statements of fact, rather than legal arguments made to a court." *NY State Nat'l Org. for Women v. Terry*, 159 F.3d 86, 97 n.7 (2d Cir. 1998) ("Plaintiffs' statements of their theory of the case do not constitute judicial admissions."). Lehman's own cases confirm that the doctrine of admissions applies only to facts.[3]

Here, the only relevant and legally operative *fact*, which is undisputed, is what the October 10 Notice itself said. Lehman cannot argue that the October 10 Notice *by its terms* purported to terminate *only* the Agreement, *rather than* the Transactions, because that is belied by the October 10 Notice itself. *See* p. 1, *supra*. Thus, Lehman merely argues that the Libra Parties' pleadings are supposedly "admissions" as to the *legal effect* of the October 10 Notice—*i.e.*, "admissions" that the effect of the October 10 Notice was only to terminate the Agreement (and not the Transactions). However, the *legal effect* of the October 10 Notice under the Credit Default Swap Agreement depends on the interpretation of the Credit Default Swap Agreement—Section 6(c)(ii) of which specifically addresses the "Effect of Designation" of an Early Termination Date for outstanding Transactions—and thus is a question of law. *See New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir. 2006) ("the existence and terms of the contract are questions of fact, but the effect of those terms on ownership is strictly a question of law if the provisions are unambiguous, for under New York law, the interpretation of an unambiguous contract is a question of law").[4]

---

[3] *See Gibbs v. Cigna Corp.*, 440 F.3d 571, 578 (2d Cir. 2006) ("***Facts*** admitted in an answer, as in any pleading, are judicial admissions") (emphasis added); *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985) ("A party's assertion of ***fact*** in a pleading is a judicial admission") (emphasis added).

[4] To the extent that Lehman argues that the Libra Parties' pleadings are "admissions" affecting the interpretation of the references in Sections 5.2(c) and 7.8(a)(xi) of the Indenture to "terminat[ion] of the Credit Default Swap

As the Second Circuit held in *Stichting Ter Behartiging v. Schreiber*, such positions cannot be "admitted" in a pleading:

> we have specified that judicial admissions are statements of fact rather than legal arguments made to a court. For this reason, the statement in Schreiber's Rule 56.1 statement . . . , that "Core . . . assigned to the former Saybolt B.V. Shareholders all of Core's" claims, cannot be taken as a concession that, under applicable law, the assignment was validly made.

407 F.3d 34, 45 (2d Cir. 2005) (citations and internal quotation marks omitted). Thus, in *Stichting Ter Behartiging*, the Second Circuit made clear that the *validity* of the assignment was a question of law not subject to "admission." So here, determining the contractual *effect* of the undisputed language of the October 10 Notice is likewise interpretation of the Credit Default Swap Agreement, and thus a question of law not subject to admission.

As is conceded by Lehman (*see infra*, p. 7), the "Effect of Designation" of an Early Termination Date is expressly governed by Section 6(c)(ii) of the ISDA Master Agreement. Thus, statements in pleadings about the effect of that designation—as Lehman argues, judicial statements "admitting" that the October 10 Notice had the effect of terminating the Agreement, and only the Agreement—represent an "interpretation of the language of the Agreement rather than factual statements, and, as such, are not judicial admissions." *Buchman v. Weiss*, 2009 WL 2044615, at *4 (S.D.N.Y. July 15, 2009). Like the purported "admissions" in *Buchman* concerning the applicability of an arbitration clause to a dispute among partners, the contractual effect of the October 10 Notice is a question of law. *See also McGriff v. Municipal Housing Auth. for Yonkers*, 2007 WL 3143706, at *2 (S.D.N.Y. Oct. 10, 2007) ("whether such notice constitutes a termination of her leasehold is a question of law").[5]

---

Agreement," Lehman seeks to use the pleadings to interpret the other contract at issue in this case, which, as shown above, is a question of law not subject to "admission."

[5] Any argument—whether by Lehman or by the Libra Parties—that terminating the Transactions has the *effect* of terminating the Agreement is flatly contrary to all of the explicit provisions in the Agreement specifying that the

In short, the concept of "judicial admissions" has no applicability here.

Moreover, Lehman's own statements to this Court in *LBSF v. BNY* (09-ap-01242) expressly contradict what Lehman claims the Libra Parties have "admitted." Lehman acknowledges that terminating the Transactions does *not* have the effect of terminating the Agreement:

- "Paragraph 9(c) of the ISDA Master Agreement expressly provides that the obligations of the parties under ***the Swap Agreement shall survive the termination of any Transaction***." Lehman MSJ ¶ 36.

- "The 'Effect of Designation' of the Early Termination Date or 'termination' itself means that 'no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the [t]erminated [t]ransactions will be required to be made, but without prejudice to the other provisions' of the ISDA. Ex. E § 6(c) (ISDA 2005); Ex. F § 6(c) (ISDA 2004); 1 GOOCH & KLEIN at 271 n.789, 2 GOOCH & KLEIN at 856. ***In other words, early termination does not extinguish the ISDA or other obligations under the underlying terminated swap transactions***." *Id.* ¶ 51.[6]

### 2. Lehman's Attempted Use Of An October 31, 2008 Letter To Argue The Legal Effect Of The October 10 Notice Under The Credit Default Swap Agreement Impermissibly Relies On Parol Evidence.

Lehman similarly suggests that an October 31, 2008 letter can be used to determine the effect of the undisputed language of the October 10 Notice. Because the effect of the October 10 Notice is governed by the Credit Default Swap Agreement (*see supra* pages 5–6), such use of

---

Agreement does *not* end on termination of all outstanding Transactions. Thus, Section 6(c)(ii) of the ISDA Master Agreement states that the "Effect of Designation" of an Early Termination Date is "without prejudice to the other provisions of this Agreement," Section 9(c) of the ISDA Master states that the Agreement "will survive the termination of any Transaction," and ISDA itself has specified that "the ISDA Master does not have any mechanism for terminating the ISDA Master, but only for the termination of outstanding Transactions." *FAQS: Lehman Brothers Close-Out* (Oct. 24, 2008).

[6] Even the treatise that Lehman cited for the first time at the hearing confirms that "[t]he effect of the designation or automatic occurrence of an Early Termination Date is to terminate the parties' obligations under the relevant Confirmations and, in certain circumstances, ***replace them*** with an obligation for one party to pay a single net sum to the other in respect of the termination." Simon Firth, DERIVATIVES LAW & PRACTICE § 11-124 (2009 rev. ed.) (emphasis added). At no point does Firth suggest that a "close-out of the Agreement," the phrase that Lehman now latches onto, is a *termination* of the Agreement. As the preceding quotation shows, Firth understands—as the ISDA Master Agreement states and as ISDA itself has confirmed—that the Agreement survives termination of Transactions, which merely "closes-out" the ongoing economic exposure under the Agreement—*i.e.*, no further payments or deliveries under Section 2(a)(i) or 2(e) of the ISDA with regard to the terminated transactions will be required to be made.

extrinsic evidence violates the parol evidence rule.[7] *See W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (N.Y. 1990) (Court may consider "extrinsic evidence only when required to do so because of some identified ambiguity"); *Cibro Petro. Prods, Inc. v. Sohio Alaska Petro. Co.*, 602 F. Supp. 1520, 1525, 1531 n.12 (party's own statements excluded as parol evidence when offered by other party).

Before the Court may consider any parol evidence, it must first find that the Indenture is ambiguous, which would require denying *both* pending motions, permitting *both* parties an opportunity to conduct discovery, and then hearing parol evidence from *both* sides. *See Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (finding ambiguity, "revers[ing] the district court's grant of summary judgment to AFT on plaintiffs' contract claim and remand[ing] this cause of action for the receipt of extrinsic proof"); *Sugerman v. MCY Music World, Inc.*, 158 F. Supp. 2d 316, 324 (S.D.N.Y. 2001) (where one party argued contract was unambiguous, and court found ambiguity, denying summary judgment motion and ordering trial at which parol evidence would be admissible).[8] Among other things, that parol evidence would show that the credit ratings that Lehman solicited for the Libra Notes were subject to a Standard & Poor's requirement that Libra have the right to terminate the Transactions upon a default by LBSF—because, among other things, had the Notes been understood to be subject to Lehman's credit risk, the two senior-most Note classes could not have been rated higher than Lehman itself.

---

[7] The use of the October 31, 2008 letter to affect the interpretation of Sections 5.2(c) and 7.8(a)(xi) of the *Indenture* would violate the parol evidence rule for the same reasons.

[8] The schedule ordered by the Court here was expressly made "subject to any need for discovery that may be authorized based on the arguments made." Scheduling Order, June 25, 2009.

## II. Lehman Misrepresents The Relevance of "Defaulted Securities": Libra Did Not Rely On A Payment Default To Terminate The Transactions.

As to Section 12.1(b) of the Indenture, Lehman again attempts to mislead the Court. Lehman asserts that "the Libra Parties seek to rely on this missed payment as a justification for termination." Tr. 117:15–16. That is incorrect. Sections 5(a)(vii) and 6(a) of the ISDA Master Agreement gave Libra the contractual right to terminate the Transactions upon the bankruptcy default by LBSF, the October 10 Notice exercised that right, and Section 560 of the Code protects the exercise of that right.[9] The missed payment was raised by the Libra Parties in their arguments only to illustrate that Lehman's claim that the termination violated Section 5.5(a) of the Indenture makes no sense. *E.g.*, Libra Cross-Motion at 50–51; Libra Reply 31–33. Thus, the Libra Parties demonstrated that Section 5.5(a) requires compliance with Section 12, which, in turn, requires termination of all Defaulted Securities. *Id.*

However, Lehman has now abandoned any claim that the termination violated Section 5.5(a). Tr. 183:10–11 ("There's a little confusion about 5.5. 5.5 was never an independent basis."). It is therefore now irrelevant whether the Transactions actually were Defaulted Securities.[10] If Lehman changes course in its response to this brief and attempts to resurrect a claim that Section 5.5(a) was violated, the Court should simply strike it.

---

[9] Lehman also incorrectly argues that assignment of the Agreement would "preserve the original economics of this transaction." Tr. 110:4. The benefit of the bargain was that Libra and the Noteholders would be protected from Lehman's credit risk by giving Libra the right to terminate the Transactions upon Lehman's bankruptcy. There is no provision requiring Libra to wait eight months—the length of time it took here—or more to find out whether LBSF wanted to assign and was able to find an appropriate assignee. Reversing the termination once a proposed assignee is found, months later, is antithetical to the goals of "certainty" and "finality" that Congress codified in Section 560 of the Code, which pointedly does not include an exception for swap agreements in which the debtor is in-the-money.

[10] Although this issue is now irrelevant, because Lehman does not assert Section 5.5 as a basis for a claim, the Libra Parties note that Lehman's argument at the hearing was incorrect. The cases Lehman cited at the hearing hold only that *termination* on the basis of a non-safe-harbored post-petition default is impermissible or that the debtor has the right to *cure* certain post-petition defaults. They do not hold that an occurrence contractually defined as a default cannot *exist* post-petition. Such an *occurrence* is sufficient for the Transactions to satisfy the definition of Defaulted Securities. *See, e.g., In re Margulis*, 323 B.R. 130, 134 (Bankr. S.D.N.Y. 2005).

The Libra Parties note, however, that the conflict between Section 12.1(b) and Lehman's reading of Section 5.2(c) illustrates the flaws in Lehman's approach (*see, e.g.*, Cross-Motion at 42–43), regardless of whether the Transactions *here* were Defaulted Securities. Whether or not that conflict is implicated on the present facts, the possibility that Section 12.1(b) could require termination of Transactions shows that Section 5.2(c) cannot be read to prohibit termination of Transactions.

## CONCLUSION

For all of the foregoing reasons, the Court should deny Lehman's Motion for Summary Judgment and grant the Libra Parties' Cross-Motion seeking a judgment declaring that the termination of the Transactions was valid.

New York, New York
September 2, 2009

        Respectfully submitted,

        /s/ Steven Wolowitz
        MAYER BROWN LLP
        Steven Wolowitz
        Brian Trust
        Mark Hanchet
        Christopher J. Houpt
        1675 Broadway
        New York, New York  10019
        (212) 506-2500

        *Attorneys for*
        *Libra CDO Limited, by Bank of America, N.A.,*
        *as successor by merger to LaSalle Bank National*
        *Association, as Trustee;*
        *Bank of America, N.A., Trustee;*
        *LaSalle Bank National Association, Trustee; and*
        *Société Générale, New York Branch*