# WEIL, GOTSHAL & MANGES LLP

1300 I STREET, N.W.
SUITE 900
WASHINGTON, D.C. 20005
(202) 682-7000
FAX: (202) 857-0940

AUSTIN
BEIJING
BOSTON
BUDAPEST
DALLAS
DUBAI
FRANKFURT
HONG KONG
HOUSTON
LONDON
MIAMI
MUNICH
NEW YORK
PARIS
PRAGUE
PROVIDENCE
SHANGHAI
SILICON VALLEY
WARSAW

RALPH I. MILLER
DIRECT LINE 202-682-7133
ralph.miller@weil.com

September 9, 2009

Honorable James M. Peck
United States Bankruptcy Judge
United States Bankruptcy Court
One Bowling Green
New York, New York 10004

Re: In re Lehman Brothers Holdings Inc., et al.,
Case No. 08-13555 (JMP)

Lehman Brothers Holdings Inc. and Lehman *Brothers Special Financing, Inc. v. Libra CDO Limited, et. al.*

Adv. Proc. No. 09-01177 (JMP)

Libra CDO Limited, by Bank of America, N.A., etc., et. al. v. Lehman Brothers Special Financing Inc.

Adv. Proc. No. 09-01178 (JMP)

Dear Judge Peck:

Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Special Financing Inc. ("LBSF") (collectively, the "Debtors"), and the Statutory Committee of Unsecured Creditors appointed in these cases (the "Creditors' Committee") submit this joint response to the "Libra Parties' Supplemental Memorandum of Law" filed on September 2, 2009 (the "Libra Supplemental Brief").

The Libra Supplemental Brief reinforces that summary judgment should be granted in favor of the Debtors, with a declaration that the purported termination of the Credit Default Swap Agreement was improper and that the Credit Default Swap Agreement is a valid, executory contract that may be assumed and assigned by LBSF to preserve the economic bargain among the parties.

The arguments of the Debtors for summary judgment are straightforward and dispositive and are based on the governing contracts and the clear record before the Court:

(1) After an acceleration of the Notes, section 5.2(c) of the Indenture prohibits the termination of the Credit Default Swap Agreement "unless the liquidation of the Collateral has begun and such declaration [of acceleration] is no longer capable of being rescinded or annulled;"

(2) It is undisputed that the Notes were accelerated and the liquidation of the Collateral has not begun;

(3) The designation of an "Early Termination Date" in the October 10, 2008 letter purported to terminate all outstanding Transactions under the Credit Default Swap Agreement and, as the Libra Parties admit, "thereby" purported to terminate the Credit Default Swap Agreement;[1]

(4) Therefore, under the facts of this case, section 5.2(c) of the Indenture prohibited the Libra Parties from designating an "Early Termination Date," that would terminate all Transactions, and thereby terminate the Credit Default Swap Agreement; and

(5) The October 10, 2008 letter, which purported to designate an "Early Termination Date" for all Transactions and the Credit Default Swap Agreement was thus ineffective because it was prohibited by section 5.2(c) of the Indenture; consequently, both the Credit Default Swap Agreement and all Transactions remain in effect, making them subject to assumption and assignment in this Chapter 11 proceeding.

In their Supplemental Brief, the Libra Parties assert that the October 10, 2008 termination notice had the effect of terminating all outstanding Transactions as well as the Credit Default Swap Agreement.[2] Yet, they ask the Court to hold that the attempted termination of the Transactions was permitted by the Indenture, even if the attempted termination of the Credit Default

---

[1] Libra Parties' Answer ¶ 30.

[2] *See* Libra Supplemental Brief at 2 (asserting that "the Libra Parties' Complaint alleged that Libra terminated both the Agreement and the Transactions"); *id.* at 3 (recognizing that in their Answer, the Libra Parties alleged that the termination of the Transactions "had the legal effect of terminating the Agreement"); *id.* (recognizing that the Libra Parties' Complaint "alleges a termination of both the Transactions and the Agreement").

Swap Agreement was invalid.[3] This argument should be soundly rejected because, as explained in the prior briefing and summarized below, there is no difference between the designation of an Early Termination Date to terminate all outstanding Transactions and the termination of the Credit Default Swap Agreement as proscribed by section 5.2(c) of the Indenture. Indeed, the Libra Parties admit this in their pleadings; the Trustee recognized this in its correspondence to noteholders; and any interpretation of section 5.2(c) that would permit the Libra Parties to designate an Early Termination Date terminating all Transactions, or to otherwise terminate all Transactions, but somehow not terminate the Credit Default Swap Agreement, would render section 5.2(c) meaningless.

1.  **The Indenture Bars Any Termination of the Credit Default Swap Agreement, Which Would Include a Termination by Designating An Early Termination Date Thereunder**

At the outset, it is important to clarify that, contrary to the statements in the Libra Supplemental Brief, it has never been the position of the Debtors that the *only* thing that happened on October 10, 2008 was the purported termination of the Credit Default Swap Agreement and not the purported termination of the Transactions. This dramatic recharacterization of the Debtors' argument is the dominant theme of the Libra Supplemental Brief.[4] But the Debtors never raised such an argument at the hearing or in their briefing; nor would they because it is based upon an illusory distinction between terminating the Credit Default Swap Agreement and terminating all of the Transactions thereunder. To the contrary, the purported designation of an Early Termination Date to terminate all of the Transactions was, and was by the Libra Parties' own understanding to be, a purported attempt to terminate the Credit Default Swap Agreement. These were not two independent events; rather, one was the necessary consequence of the other. Therefore, section 5.2(c)'s prohibition on termination of the Credit Default Swap Agreement equally prohibited the designation of an Early Termination Date to terminate all of the Transactions. The Debtors, of course, recognize that the Transactions were purportedly terminated through the designation of an Early Termination Date. The Debtors' consistent position is that this purported termination of all of the outstanding Transactions comes within the prohibition of terminating the Credit Default Swap

---

[3] *See* Libra Parties' Supplemental Brief at 2 (asking the court to "uphold the termination of the Transactions . . . even if it also grants the portion of the Lehman Motion seeking a declaration that the Agreement was never terminated").

[4] *See* Libra Supplemental Brief at 2 ("Lehman incorrectly (and for the first time) asserted that the Libra Parties had alleged in their Complaint that the October 10 Notice terminated only the Credit Default Swap 'Agreement' . . . ."); *id.* at 4 ("Lehman now apparently argues that the Libra Parties have conceded that only the Agreement was terminated."); *id.* at 6 ("Lehman argues [that the Libra Parties made] judicial statements 'admitting' that the October 10 Notice had the effect of terminating the Agreement, and only the Agreement . . . .").

Honorable James M. Peck
September 9, 2009
Page 4

Agreement because terminating all of the outstanding Transactions effects a termination of the Credit Default Swap Agreement, and was thus barred by section 5.2(c).[5]

In their supplemental briefing, the Libra Parties now make the tortured argument that the October 10, 2008 letter – despite the inconsistent admission of the Trustee in its October 31, 2008 letter to noteholders[6] and judicial admissions by the Libra Parties in their pleadings – should be recharacterized as keeping in effect the Credit Default Swap Agreement, which is defined to include the "documents and other confirming evidence . . . exchanged between the parties confirming" all Transactions, yet somehow terminating all obligations under those documents. Neither the record nor logic supports that mischaracterization of the October 10, 2008 letter. The Libra Parties admit "the economic effect of terminating all Transactions is the same as that of terminating the overarching Credit Default Swap Agreement."[7] This concession is completely consistent with the structure of the transaction documents because there is no independent economic significance to the ISDA Master Agreement or its Schedule without the Transactions thereunder. Put simply, without the Transactions, the ISDA Master Agreement is just a shell of a potential agreement, and not a "credit default swap agreement" under the definition in the Indenture or as a matter of common sense. Indeed, it is not even a potential agreement once acceleration of the notes occurred because section 5.2(a) provides that no further investment by Libra, which includes entry into Transactions, is permitted after acceleration of the notes.[8] Therefore, once an Early Termination Date is designated and all of the Transactions are terminated, the Credit Default Swap Agreement likewise terminates.[9]

---

[5] Furthermore, the Libra Parties' attempt to justify the designation of an Early Termination Date for the Transactions, despite section 5.2(c)'s prohibition on termination of the Credit Default Swap Agreement, is not supported by the definitions in the Indenture. The Indenture defines "Credit Default Swap Agreement" to include the ISDA Master Agreement, the Schedule, *and* the Confirmations evidencing the Transactions thereunder. *See* Indenture at 15. The ISDA Master Agreement defines "Confirmation" as "the documents and other confirming evidence (each a Confirmation) exchanged between the parties, confirming . . . Transactions." ISDA Master at 1 Hershan Decl. Ex. A. at 1. The restriction in section 5.2(c), by express definition, thus prohibits terminating the "documents and other confirming evidence . . . exchanged between the parties confirming" the Transactions.

[6] Hershan Decl. Ex. F.

[7] Libra Parties' Mot. for Summ. Judg. at 58.

[8] The same declaration of acceleration that activates the protections of 5.2(c) would automatically terminate the ability of the parties to place new Transactions under the ISDA Master Agreement. *See* Hershan Decl. Ex. B § 5.2(a).

[9] "If an Event of Default occurs, the Non-Defaulting Party may, at any time while the event is continuing, *close out the Agreement and all outstanding transactions under it*. The close-out is effected by the giving of a written notice to the Defaulting Party specifying the date on which the close-out is to take effect. This is referred to as the Early Termination Date." Simon Firth, DERIVATIVES LAW & PRACTICE § 11-102 (2009 rev. ed.) (emphasis added). And this is

The Trustee understood that it purported to terminate the Credit Default Swap Agreement when it designated an Early Termination Date, as evidenced by the October 31, 2008 notice to the noteholders, which unambiguously stated that "[O]n October 10, 2008, [Société Générale], as the Controlling Class, *directed the Trustee to terminate the Credit Default Swap Agreement* and the Trustee delivered *a notice of termination of the Credit Default Swap Agreement* to LBSF establishing October 10, 2008 as the 'Early Termination Date' under the Credit Default Swap Agreement."[10] Similarly, the Libra Parties' Answer "admit[s] that Libra terminated the Credit Default Swap Agreement"[11] and states "that on October 10, 2008, the Trustee declared October 10, 2008, to be the Early Termination Date for all outstanding Transactions under the Credit Default Swap Agreement, thereby terminating the Credit Default Swap Agreement."[12] The Libra Parties' Complaint is also replete with similar admissions.[13] For instance, in Paragraph 30, the Libra Parties admitted that "Libra did, in fact, terminate the CDS Agreement." And the prayer for relief in their Complaint requests a declaration that "the termination of the CDS Agreement by Libra is valid." Compl. at p. 16. It was not until after the Libra Parties learned the arguments in the Debtors' motion for summary judgment that the Libra Parties attempted to separate and distinguish the purported designation of an Early Termination Date from the purported termination of the Credit Default Swap Agreement. The Libra Parties' attempt to recharacterize what occurred should fail.

The Libra Parties attempt to excuse these clearly contradictory positions by arguing that the October 31, 2008 notice is parol evidence. But the "parol evidence rule does not apply when the evidence sought to be introduced does not contradict the express terms of the written agreement in question." *In re Thomson McKinnon Secs., Inc. v. Harris*, 139 B.R. 267, 273 (S.D.N.Y. 1992). The October 31, 2008 letter is not parol evidence because it is not evidence of a "prior oral or written agreement or any contemporaneous oral agreement" that is "offered to contradict, vary, add to, or subtract from the terms of the writing." *In re Kharisma Jewelry*, 165 B.R. 371, 374 (Bankr. E.D.N.Y. 1994).[14] To the contrary, it is a post-contractual document that

---

precisely what the October 10, 2008 notice attempted to accomplish, as admitted by the Libra Parties – it purported to terminate the Credit Default Swap Agreement, which section 5.2 (c) prohibited.

[10] Hershan Decl. Ex. F.

[11] Libra Parties' Answer ¶ 4.

[12] *Id.* ¶ 30.

[13] *See, e.g.*, Compl. ¶¶ 6-11, 30, 42, 46, 50, 56-58, 62, 64, 65 and page 16.

[14] *Stroll v. Epstein*, 818 F. Supp. 640, 645 (S.D.N.Y. 1993) ("'the parol evidence rule operates to exclude evidence of all prior and contemporaneous negotiations or agreements offered to contradict or modify the terms of their writing.'") (quoting *Adler & Shaykin v. Wachner*, 721 F. Supp. 472, 479 (S.D.N.Y. 1988)).

shows clearly that the Trustee's purported designation of an Early Termination Date purported to terminate the Credit Default Swap Agreement and therefore was prohibited by section 5.2(c).

Likewise, the Libra Parties try to avoid the binding effect of the statements in their Answer and Complaint by arguing that such statements are legal conclusions, not factual admissions. But the Libra Parties' Answer belies this attempt. Nowhere in paragraphs 4 and 30 of the Answer do the Libra Parties even suggest that the allegations in the Complaint to which they were responding called for a legal conclusion. Elsewhere in their Answer, in contrast, the Libra Parties repeatedly identify allegations that they contend call for legal conclusions: Answer ¶ 7 ("Defendants deny the allegations contained in Paragraph 7 of the Complaint, except for those that are legal conclusions, as to which a responsive pleading is not required."); ¶ 11 ("the third sentence contains legal conclusions, as to which a responsive pleading is not required"); 12, 13, 16, 35 (all same). Had paragraphs 4 and 30 of the Answer called for a legal conclusion, such that an answer would not have been a judicial admission, the Libra Parties could have identified it as such, but they did not. Instead, they denied part of the allegation, and then expressly admitted that "the Trustee declared October 10, 2008, to be the Early Termination Date for all outstanding Transactions under the Credit Default Swap Agreement, thereby terminating the Credit Default Swap Agreement ...." Answer ¶ 30. What the Libra Parties admitted in paragraphs 4 and 30 of their Answer are legally binding judicial admissions that on October 10, 2008, the Credit Default Swap Agreement and Transactions purportedly were terminated, and the undisputed record shows, as a matter of law, that such attempted termination violated the clear and unambiguous terms of section 5.2(c).

The repeated admissions by the Libra Parties that the designation of an Early Termination Date terminated the Credit Default Swap Agreement are consistent with all the other summary judgment evidence in this record, and those admissions cannot be contested by unsworn arguments in briefs. Debtors filed their summary judgment after those admissions were in the record and in reliance on the absence of any dispute about this critical issue. The Court should not countenance such an about-face that occurred only after the Libra Parties were confronted with a motion for summary judgment.

This conclusion is particularly appropriate because the Libra Parties' argument that there is a distinction between a termination of the Credit Default Swap Agreement and the designation of an Early Termination Date to terminate all Transactions would render section 5.2(c) meaningless. As stated above, the Libra Parties recognize that there is no economic difference between the designation of an Early Termination Date to terminate all Transactions and the termination of the Credit Default Swap Agreement. Therefore, if the designation of an Early Termination Date did not also terminate the Credit Default Swap Agreement, then section 5.2(c) would offer no protection to any party. This can be illustrated through the Libra Parties' own argument regarding the alleged purpose of section 5.2(c). They have argued that section 5.2(c) is important to protect the noteholders from a consensual termination of the Credit Default Swap

Honorable James M. Peck
September 9, 2009
Page 7

Agreement by Libra and LBSF.[15] While the Debtors do not believe that section 5.2(c) prohibits only consensual termination but allows non-consensual termination (as there is nothing in section 5.2(c) that mentions a consensual termination), section 5.2(c) would not even provide protection to the noteholders from consensual termination under the Libra Parties' interpretation, because Libra and LBSF could agree, according to the Libra Parties, to terminate all of the Transactions without violating section 5.2(c).[16] This would have the same effect as terminating the Credit Default Swap Agreement in any other fashion, thus leaving the noteholders with no protection.[17] It goes without saying that the Court should not construe the contract in a manner that would render meaningless the important protections of section 5.2(c) for both the noteholders and LBSF. *See, e.g.*, *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless .... is not preferred and will be avoided if possible.").

The Libra Parties also make much of the fact that the form ISDA Master Agreement may have continued despite the termination of all Transactions.[18] But this does not mean that the Credit Default Swap Agreement, as defined in the Indenture, would not terminate if its critical economic component was terminated through the designation of an Early Termination Date. LBSF recognizes that the form ISDA Master Agreement continues to provide limited obligations in connection with the settlement of the terminated Transactions, and that there is not a mechanism to terminate the ISDA Master Agreement. But this fact is irrelevant because section 5.2(c) refers to the termination of the Credit Default Swap Agreement, which is defined to be more than simply the

---

[15] *See* Libra Parties' Reply Brief at 27 (arguing that 5.2(c) exists to protect against the "danger ... that the Controlling Class could agree [with LBSF] to a consensual termination without input from other Noteholders").

[16] Moreover, even without the language from section 5.2(c) at issue in these proceedings, the noteholders have separate protection in the Indenture from a consensual termination of the Credit Default Swap Agreement by LBSF and the Controlling Class that would divert collateral away from noteholders, which the Libra Parties now postulate as the sole risk section 5.2(c) was created to avoid; any action by the Controlling Class to effect a "Sale of Collateral" (which would include termination of the Credit Default Swap Agreement) requires compliance with Section 5.5(a), *i.e.*, either proceeds must be sufficient to pay all notes in full or a supermajority of noteholders, including junior noteholders, must approve the sale.

[17] The structure of the Indenture makes this clear because, as noted earlier (*see supra* n.8), section 5.2(c) is effective only after a declaration of acceleration occurs, and that same declaration operates through section 5.2(a) to prevent any future Transactions from being implemented under that ISDA Master Agreement. The only possible function of section 5.2(c) is thus to protect the existing Transactions.

[18] There is no disagreement that the form ISDA Master Agreement survives termination of the Transactions and Credit Default Swap Agreement, which is precisely the point LBSF tries to make in the *LBSF v. BNY* (09-ap-01242) case, to which the Libra Parties refer in their Supplemental Brief. Of course, the *BNY* case involves a different set of issues, in a completely different commercial context, and statements made in the context of the BNY proceeding do not inform any decisions here.

ISDA Master Agreement. Again, if section 5.2(c) were limited to situations where the Master Agreement itself also was terminated then it would open wide the ability for parties to terminate indirectly what they could not terminate directly. The Court should not construe the Indenture to have left such a gaping loophole. *Cf. In re Ernie Haire Ford, Inc.*, 403 B.R. 750, 760-61 (M.D. Fla. 2009) (holding that where termination of contract was prohibited, the "functional termination" of the contract was also prohibited).

### 2. The Indenture Did Not Mandate the Termination of the Credit Default Swap Agreement.

Finally, by recognizing that section 12.1 of the Indenture is not implicated where the basis for the termination is a bankruptcy, the Libra Parties effectively have withdrawn their argument that the Indenture mandated the termination of the Credit Default Swap Agreement.[19] This leaves them with the argument that Libra could have relied upon a provision in the ISDA Master Agreement that permitted termination upon the bankruptcy of LBHI, even though section 5.2(c) of the Indenture placed additional limitations on the termination of the Credit Default Swap Agreement until after the acceleration of the notes had begun. For all of the reasons stated in the prior briefing and at the hearing, this argument also should be rejected. The Court should conclude that section 5.2(c) of the Indenture prohibited Libra's termination of the Credit Default Swap Agreement. Therefore, the termination was not effective and the Credit Default Swap Agreement is an existing executory contract that may be assumed and assigned.

---

[19] The Libra Parties state that LBSF is "mislead[ing] the Court" by arguing that the Libra Parties were relying on section 12.1(b) and a payment default to justify termination. But this is exactly what the Libra Parties argued on page 4 of their original summary judgment brief: "Sections 5.2(c), 5.4, and 5.5(a), according to Lehman, supposedly *barred* termination of the Credit Default Swap Agreement, but Lehman's reading would contradict section 12.1(b), which *required* termination of all Transactions in these circumstances." They repeated this argument on page 41 by stating that section 12.1 "expressly required termination." And the Libra Parties continued this argument on pages 9-10 of their reply brief, stating that section 12.1(b) of the Indenture required the termination of the Credit Default Swap Agreement because "LBSF failed to make a payment due on October 3, 2008 and that it did not cure that failure within three business days after notice" and that "that payment default rendered the Transactions 'Defaulted Securities' under the Indenture." Although the Libra Parties now withdraw this argument in light of their recognition that the Bankruptcy Code prohibited the termination of the Credit Default Swap Agreement on this basis, they plainly took this position in their papers.

WEIL, GOTSHAL & MANGES LLP

Honorable James M. Peck
September 9, 2009
Page 9

Respectfully submitted,

/s/ Ralph I. Miller
Ralph I. Miller
Lori R. Fife
Robert J. Lemons
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Attorneys for Debtors
and Debtors in Possession

– and –

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP

By: /s/ Eric D. Winston
Susheel Kirpalani (SK8926)
James Tecce (JT5910)
51 Madison Avenue
New York, New York 10010
Telephone No.: (212) 849-7000
Facsimile No.: (212) 849-7100

Eric D. Winston (Cal. No. 202407)
Erica Taggart (Cal. No. 215817)
865 South Figueroa Street, 22nd Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile No.: (213) 443-3100
Special Counsel for Official Committee of Unsecured Creditors
of Lehman Brothers Holdings Inc.

cc: Steven Wolowitz (*via overnight delivery and email*)
Brian Trust (*via overnight delivery and email*)